## GEORGIANNA POTTER et al.

*v.*

## MARY ANN CLAPP.

*Opinion filed June 16, 1903—Rehearing denied October 8, 1903.*

1. MARRIAGE—*rule where cohabitation is meretricious in its inception.* Cohabitation meretricious in its inception is presumed to continue so until proved to have become matrimonial, which fact may be shown by direct or circumstantial evidence, and is evidenced by a subsequent lawful marriage between the parties.

2. SAME—*when marriage is absolutely void.* A marriage is absolutely void if either of the parties had a lawful wife or husband living and undivorced at the time.

3. SAME—*party attacking second marriage has the burden of proof.* One attacking a ceremonial marriage upon the ground that the husband, at the time, had a former wife living who did not obtain a divorce from him until two years later, has the burden of proving that the husband had not been divorced from such former wife before the second marriage.

4. RES JUDICATA—*when validity of marriage is res judicata.* Where the heirs appear in a proceeding for the allowance of the widow's award and contest such allowance upon the ground that the petitioner was not lawfully married to their father, the judgment of the court allowing such award is a finding as to the legality of such marriage, and is binding upon the heirs until reversed.

5. TRUSTS—*a resulting trust does not rest in contract.* A resulting trust arises by implication of law, and cannot, where the Statute of Frauds is pleaded, arise from a parol agreement to hold the title for a third person who advances the purchase money.

6. HOMESTEAD—*rule as to homestead estate in a flat-building.* The homestead estate of a widow in a flat-building or apartment house is confined to the flat or apartment occupied by her as a residence, provided such flat or apartment is of the value of $1000.

7. SAME—*when widow should account for rent of flat.* If the widow remains in possession of a flat-building upon an understanding with the heirs that, pending the settlement of their respective rights, she should occupy the lower flat as a residence and rent the upper flat, accounting to the heirs for the rent, she should be required to make such accounting.

8. DOWER—*when demand for dower is unnecessary.* An agreement between the widow and the heirs whereby she was to remain in possession of the property and collect the rents pending a settlement of their respective rights, makes a demand for dower unnecessary on her part.

9. SAME—*rule as to dower where the husband has a divorced first wife.* Where a divorced wife is entitled to dower, if the husband has married again the first wife takes dower subject to the homestead estate of the second wife, and the latter takes dower subject to the dower estate of the first wife and subject to her own homestead estate.

10. EQUITY—*equity may assume jurisdiction of settlement of estate in a proper case.* While a court of equity will not ordinarily assume jurisdiction in the settlement of the estate of a deceased person, yet it may do so in a proper case.

APPEAL from the Circuit Court of Cook county; the Hon. JOSEPH P. ROBARTS, Judge, presiding.

This was a bill in chancery filed by Mary Ann Clapp in the circuit court of Cook county, as widow of James H. Clapp, deceased, against Georgianna Potter, Annie L. Wilcox and Albert G. Clapp, his children by a former marriage, for the assignment of dower and homestead in the real estate of which he died seized, the establishment of a resulting trust in said real estate to the extent her money had paid therefor, and for an accounting. Mary M. Clapp, the divorced wife of the said James H. Clapp, intervened, by leave of court, as a claimant for dower. Answers, a cross-bill and replications having been filed, the case was referred to a master, and his report having been filed, a decree was entered in accordance with the recommendations thereof, and the children of James H. Clapp have prosecuted an appeal.

It appears from the pleadings, evidence and master's report that James H. Clapp, on May 12, 1856, was married to Mary M. Dean at Taunton, Mass., by a ceremonial marriage; that said James H. and Mary M. thereafter lived together as husband and wife at Providence, R. I., and other places in that vicinity, for the period of about nineteen years; that there were born to them during that period three children, viz., Georgianna, Annie L. and Albert G., who are defendants to this bill; that in September, 1875, said James H. Clapp and Mary M. sepa-

203—38

rated, and soon thereafter Clapp located in Chicago. It further appears that the complainant, Mary Ann, in the year 1862, (her maiden name being Mary Ann Hartnett,) married one William S. Seamans and lived with him at Smithfield, R. I., for four or five years, when they separated, and for a number of years she resided with her sister, Margaret Coombs, at Providence, R. I. In August, 1875, she drew from the Providence Institution for Savings her entire deposit, amounting to $1437.31, and some time thereafter went to Chicago; that about the year 1876 James H. Clapp and Mary Ann Seamans were living together as husband and wife in the city of Chicago, where they continued to reside as husband and wife until the death of James H. Clapp, on December 1, 1897; that William S. Seamans died in an insane asylum in the State of Rhode Island, October 30, 1883, and on July 21, 1885, the complainant (under the name of Mary A. Seamans) and James H. Clapp were married at Portland, Me., by Melville A. Floyd, a justice of the peace; that Mary M. Clapp, at the October term, 1887, of the Supreme Court of Rhode Island, was divorced from James H. Clapp on the ground of desertion, on service by copy of bill in Chicago upon James H. Clapp. The complainant has no children and was about fifty-eight years of age at the time of the death of James H. Clapp. There is no direct evidence in the record which shows that the complainant knew that James H. Clapp had a wife living while she was living with him as his wife, or that James H. Clapp knew that the complainant had a husband living during any part of that period. Neither does it appear from any direct evidence that William S. Seamans was ever divorced from the complainant or she from him, or that James H. Clapp was divorced from his wife Mary M. prior to July 21, 1885. James H. Clapp seems to have had no communication with any of his family from about 1876 to 1887, when his son, Albert G., receiving information which led him to believe his father was living in Chicago, wrote

him, and after that James H. Clapp corresponded quite regularly with his children up to the time of his death. He visited them and they visited him, and his son, Albert G., attended his funeral. The complainant, from the time she commenced living with James H. Clapp, bore his name, was called by him his wife, and was so recognized by his neighbors and acquaintances, and in his letters to his children he referred to her as his wife, and when they visited at his house in Chicago he spoke of her as his wife and she was recognized and treated by all as his wife. This relation was continued after the death of Seamans, in 1883, after the ceremonial marriage in 1885, and the divorce of Mary M. Clapp, in 1887.

In 1883 the real estate in controversy, which consists of two twenty-five-foot lots located in the city of Chicago, which is now worth, with the improvements thereon, from $12,000 to $15,000 and produces a rental of about $85 per month, was purchased for $4000, and title taken in the name of Mary Ann Clapp. About two-thirds of the purchase price was paid in cash and a deed taken for the premises, subject to a mortgage for the balance of the purchase price, which was subsequently paid. In 1885 Mary Ann Clapp and James H. Clapp conveyed said real estate to Henry D. Nichols and he immediately conveyed the same to James H. Clapp, and the legal title remained in Clapp at the time of his death. After the purchase of the property a three-story brick flat-building and a story-and-a-half frame cottage were erected, and the two-story frame building standing upon the premises at the time of the purchase, the lower story of which was used by Clapp as a residence and the upper story of which was rented, was repaired. The cottage was not completed at the time of Clapp's death and was afterwards completed by complainant. At the time Albert G. Clapp was in Chicago in attendance upon his father's funeral, complainant stated to him that the cottage was not completed; that there were debts unpaid, and ad-

vised with him as to what had best be done towards a settlement óf the estate of James H. Clapp. After talk- ing with an attorney he stated to the complainant, in substance, that she was entitled, as widow, to adminis- ter upon the estate, and that she, being in Chicago and the heirs all non-residents, could better than they rent the real estate, and also advised that the cottage then commenced be completed, and that her rights and the rights of the heirs could be subsequently adjusted. The complainant took out letters of administration in the probate court of Cook county, as widow, upon the estate of James H. Clapp, and filed an inventory, appraisement and appraisers' estimate for widow's award. Afterwards the heirs appeared in the probate court and filed objec- tions to the approval of the inventory and appraisement and to the allowance of the widow's award, one ground of objection to the allowance of the widow's award being that the complainant was not the lawful wife of said James H. Clapp at the time of his death. The court overruled said objection, approved the inventory and appraisement and allowed the widow's award to com- plainant, which order remains in full force and unappealed from. In the title papers to the real estate in which the complainant claims dower and homestead and through which the defendant's claim title, the complainant is des- ignated as the wife of James H. Clapp. Only one, how- ever,—a release of a mortgage,—bears date subsequent to 1887, the date of the divorce of Mary M. Clapp.

F. P. READ, for appellants:

Cohabitation illicit in its origin is presumed to con- tinue illicit, and such presumption is stronger than the presumption of marriage. *Canjolle* v. *Farnie,* 23 N. Y. 106; *Clayton* v. *Wardell,* 4 id. 230; *Lapsley* v. *Grierson,* 1 H. L. Cas. 498; *Cunningham* v. *Same,* 2 Dowl. 483; Am. & Eng. Ency. of Law, 19, 48; *Insurance Co.* v. *Riegal,* 113 Pa. St. 204; *Yardley's Estate,* 75 id. 211; *Hunt's Appeal,* 86 id. 294;

*Collins* v. *Voorhees*, 14 L. R. A. 364; *Cartwright* v. *McGown*, 121 Ill. 388.

A presumption of divorce only arises upon proof of an actual and valid marriage. *Johnson* v. *Johnson*, 114 Ill. 611; *O'Gara* v. *Eisenlohr*, 38 N. Y. 296; *Randlett* v. *Rice*, 141 Mass. 385; *Schmisseur* v. *Beatrie*, 147 Ill. 210; *Cartwright* v. *McGown*, 121 id. 406.

It only requires slight evidence to overcome a presumption of divorce. Plenary proof is not required to rebut such presumption. *Cartwright* v. *McGown*, 121 Ill. 406; *Williams* v. *Williams*, 63 Wis. 59; *Cole* v. *Cole*, 153 id. 585; *Schmisseur* v. *Beatrie*, 147 id. 210.

Where a wife secures a divorce for her husband's fault and after the marriage the husband marries again, the first wife is entitled to dower, from the death of the husband, in all of the realty of which he dies seized and possessed. The second wife takes her homestead and dower rights subject to the dower right of the first wife. *Stahl* v. *Stahl*, 114 Ill. 375; *Brown* v. *Brown*, 142 id. 409.

To raise a resulting trust in favor of a wife on the ground that her money went into the purchase of the land, that fact must be proven. *Keith* v. *Miller*, 174 Ill. 71; *Thomas* v. *Chicago*, 55 id. 403; *Corder* v. *Corder*, 124 id. 229.

Resulting trusts arise not by contract, but by implication of law. *Mayfield* v. *Forsyth*, 114 Ill. 32; *Benson* v. *Benson*, 163 id. 306.

Courts take judicial notice of the division of town and city property into blocks and lots. *Gardner* v. *Eberhart*, 82 Ill. 316.

The excess over and above the $1000 in value of the premises occupied as a homestead may be sold by the owner, or taken on attachment or sold on execution, like any other property. *Walker* v. *Doane*, 108 Ill. 236; 101 id. 628; *Eldredge* v. *Pierce*, 90 id. 474; *Hotchkiss* v. *Brooks*, 93 id. 386; *Mix* v. *King*, 55 id. 434.

The estate of homestead is not $1000 worth of land, but $1000 is the value of the homestead premises to which

the estate of homestead attaches. Such estate in the surviving wife is her right to occupy land of that value. *Merritt* v. *Merritt*, 97 Ill. 243.

Where the value of the property to which homestead attaches is more than $1000 the excess is unaffected by the estate of homestead. *Kitterlin* v. *Insurance Co.* 134 Ill. 647; *Wilson* v. *Bank*, 166 id. 9.

Occupancy, actual and in fact, of the premises as a dwelling place is essential to the right of homestead, and the permanent devotion of a part of such premises to a purpose inconsistent with its use as a part of the homestead amounts to an abandonment of the part so used. *Langton* v. *Maxey*, 74 Tex. 155; *Preiss* v. *Campbell*, 59 Ala. 635; *Stow* v. *Lillie*, 63 id. 257; *Kaster* v. *McWilliams*, 41 id. 302; Kales on Homesteads, sec. 251, and cases cited.

A. N. TAGERT, for appellee.

Mr. CHIEF JUSTICE HAND delivered the opinion of the court:

The first question which is presented for consideration upon this record is, was the complainant, Mary Ann Clapp, the lawful wife of James H. Clapp at the time of his death? It clearly appears that at the time James H. Clapp and Mary Ann commenced living together in the city of Chicago, ostensibly as husband and wife, James H. Clapp had a lawful wife then living and that Mary Ann had a lawful husband then living. Their cohabitation was therefore meretricious in its inception, and the presumption of law is that it so continued so long as they continued to live and cohabit together, unless the proof shows that the evil purpose of the parties subsequently changed and that the cohabitation lost its unlawful character and became matrimonial in its intent and character, which intent and character may be shown by direct or circumstantial proof, and would be evidenced by a lawful marriage between the parties subsequent to the removal of the disability of each to enter into a law-

ful marriage contract. (*Cartwright* v. *McGown*, 121 Ill. 388; *Robinson* v. *Ruprecht*, 191 id. 424; *Manning* v. *Spurck*, 199 id. 447.)   At the time of the ceremonial marriage between James H. Clapp and Mary Ann, on the 21st day of July, 1885, William S. Seamans, the former husband of Mary Ann, had died, and the impediment to her marriage had been removed.   The wife of James H. Clapp, however, was then living, and she did not become divorced from him until more than two years after that date, and was still his lawful wife unless he had before the date of said ceremonial marriage been divorced from her, as the rule universally recognized by the courts is, that a marriage between parties, where either the man or the woman has a lawful wife or husband living at the time of the marriage, is absolutely void. (*Schmisseur* v. *Beatrie*, 147 Ill. 210.)   True it is, at the time of the marriage of the parties in the State of Maine the proof does not show that Mary Ann then knew that James H. Clapp had a lawful wife living, but Clapp knew that fact unless he had been divorced from her, and his knowledge made the continuation of the relation between the parties meretricious, and the ceremonial marriage on the 21st of July, 1885, between the parties was void unless James H. Clapp had been before that time divorced from Mary M. Clapp. Mary M. Clapp did not obtain a divorce from Clapp at her suit until in October, 1887, but the record is silent as to the fact whether or not James H. Clapp, prior to the time of the ceremonial marriage with Mary Ann, had been divorced from Mary M.   In *Cartwright* v. *McGown*, *supra*, on page 396 it was said: "When the celebration of a marriage is once shown, the contract of marriage, the capacity of the parties, and, in fact, everything necessary to the validity of the marriage, in the absence of proof to the contrary, will be presumed."

As Mary M. was living in 1885, the presumption is that James H. Clapp had been divorced from her prior to the celebration of his marriage to Mary Ann on the 21st

day of July, 1885. The effect of this presumption was to cast the burden upon the defendants, who are attacking said marriage in this suit, to rebut such presumption. In *Coal Run Coal Co.* v. *Jones,* 127 Ill. 379, on page 386 it was said: "The second marriage being shown in fact, the law raises a strong presumption in favor of its legality, which we do not regard as overcome by mere proof of a prior marriage and that the first wife had not obtained a divorce. (See *Johnson* v. *Johnson,* 114 Ill. 611.) The husband might have obtained such divorce and left him free to contract the second marriage." And in *Schmisseur* v. *Beatrie, supra,* on page 215 the court said: "The two marriages of Nicholas Beatrie, Jr., and the existence of the first wife at the time of the second marriage being established by proof, the presumption would arise in favor of a divorce from his first wife in order to sustain the second marriage. In view of this presumption the burden of proof rested upon the appellants, as the objecting parties, to show that there had been no divorce. The law is so positive in requiring a party who asserts the illegality of a marriage to take the burden of proving it, that such requirement is enforced even though it involves the proving of a negative."

It is said, however, if it be conceded that the burden of proof was upon the defendants to rebut the presumption that James H. Clapp had been divorced from Mary M. prior to the celebration of his marriage with Mary Ann, in 1885, as the proof shows that James H. Clapp abandoned his wife Mary M., and that he had no grounds for divorce and could not have legally obtained a divorce from her, such presumption is rebutted,—citing *Cole* v. *Cole,* 153 Ill. 585, and other cases. The only evidence in the record in support of such contention is that of the defendants Annie L. Wilcox and Albert G. Clapp. Mrs. Wilcox testified: "I did not know what had become of my father for a period of twelve years. The trouble at the time my father deserted my mother and his children

was between my sister's intended husband,—nothing that I know of on my mother's account. He didn't tell me or any other member of his family where he was going when he left on September 20, 1875." Albert testified: "He ceased to live with my mother upon general dissatisfaction with business and relatives in Providence,—not through any fault in my mother." It must be remembered that said defendants were young at the time their mother and father separated, and that they naturally sympathized with the mother. They are parties to and directly interested in the result of this suit, and their testimony, in the nature of things, would be adverse to the complainant. James H. Clapp and Mary M. had been living apart for ten years prior to his marriage to Mary Ann, in 1885. He was a business man, and necessarily had some experience in the ways of the world and knew something of the law, and it would hardly be presumed that he would enter blindly into a marriage with the complainant at a time when he knew he had a lawful wife, the effect of which would be to subject him to a prosecution for bigamy. The parties lived together openly as husband and wife for two years after the marriage in 1885 and prior to the divorce of Mary M. in 1887, and thereafter continued to live together until his death, in 1897, the complainant during all that time, so far as the evidence shows, resting secure in the belief that she was the lawful wife of James H. Clapp. After the death of Seamans there was no legal impediment to the marriage of James H. Clapp and Mary Ann Clapp so far as she knew, and subsequent to the marriage in 1885 they lived together as husband and wife for a period of twelve years and until the death of Clapp. They held themselves out to the world as husband and wife and were recognized as such by their friends and relatives. Clapp wrote and spoke to his children of the complainant as his wife. The defendant Albert G. visited at his father's home with his bride upon his wedding trip, in 1888. Mrs. Wilcox

visited the World's Fair in 1893, and she and her husband stopped at her father's house for some length of time. At the time of the death of James H. Clapp, Albert G. attended the funeral, recognized the right of the complainant, as widow, to administer upon his father's estate, and the probate court, without objection on the part of the defendants, appointed her administratrix thereof. In the title deeds under which the father held the property which the defendants inherit from him, the complainant is designated as the wife of James H. Clapp.

In view of all these facts and circumstances, we think the master and the chancellor were justified in holding that the evidence of Mrs. Wilcox and Albert G. Clapp, given after the death of James H. Clapp, was not sufficient to overcome the presumption that James H. Clapp had been divorced from Mary M. Clapp prior to his marriage to Mary Ann Clapp in July, 1885.  Furthermore, while the proceeding in the probate court of Cook county for the allowance of an award to the complainant was pending, the defendants, as heirs of James H. Clapp, appeared by attorney and contested her right to an award upon the ground that she was not lawfully married to James H. Clapp and was therefore not his widow.  The court held against them upon that proposition, and allowed to the complainant, as widow of James H. Clapp, a widow's award out of his estate.  The precise question presented here was presented there.  The heirs of James H. Clapp had the right to appeal from that order, and having failed to do so, we think they are bound by the adjudication there made and cannot now attack that finding and judgment collaterally.  The proceeding was, in effect, between Mary Ann Clapp and the heirs of James H. Clapp, deceased, and affected their interests only. The probate court had jurisdiction of the parties and the subject matter of the suit, and the court, in allowing to the widow an award, necessarily held that she was the lawful widow of James H. Clapp, deceased, and that judg-

ment is binding upon the heirs until reversed in a direct proceeding. In *Hanna* v. *Read*, 102 Ill. 596, on page 602 the court said: "Where some specific fact or question has been adjudicated and determined in a former suit, and the same fact or question is again put in issue in a subsequent suit between the same parties, its determination in the former suit, if properly presented and relied on, will be held conclusive upon the parties in the latter suit, without regard to whether the cause of action is the same in both suits or not. This species of estoppel is known to the law as an estoppel by verdict, and is equally available to a plaintiff in support of his action, when the circumstances warrant it, as when offered by a defendant as matter of defense. * * * Whether the adjudication relied on as an estoppel goes to a single question or all the questions involved in a cause, the fundamental principle upon which it is allowed in either case is, that justice and public policy alike demand that a matter, whether consisting of one or many questions, which has been solemnly adjudicated by a court of competent jurisdiction, shall be deemed finally and conclusively settled in any subsequent litigation between the same parties, where the same question or questions arise, except where the litigation is a direct proceeding for the purpose of reversing or setting aside such adjudication."

The evidence shows that at about the time complainant left Rhode Island she had in cash $1437.31. What she did with it does not appear. At the time the real estate was purchased, in 1883, a cash payment of $2666.66 was made thereon and an encumbrance of $1333.34 was assumed. The title thereto was taken in the name of Mary A. Clapp. In 1885 she conveyed said premises to James H. Clapp through Henry D. Nichols, and the title rested in him at the time of his death. As we understand the contention of complainant, it is claimed that James H. Clapp held said premises in trust for Mary Ann Clapp to the extent that her funds entered into the payment of

the purchase money therefor, which it is said was to the extent of $2000. A number of witnesses testified that James H. Clapp had stated to them he was indebted to his wife, Mary Ann Clapp, in various sums, ranging in amounts from $2000 to $4000. There is, however, no evidence in the record which tends to support a resulting trust in her favor in said real estate. A resulting trust arises by implication of law, and does not grow out of a contract. The title to the real estate was taken in the name of Mary Ann Clapp at the time of the purchase, and in 1885 she conveyed the title to James H. Clapp, and even though it were conceded at that time he agreed to hold it for her benefit or to re-convey it to her, as the bill alleges, such contract or agreement, unless evidenced in writing, would be within the Statute of Frauds and not enforceable, where the statute, as here, is pleaded. Express trusts do not rest in parol, but must be evidenced in writing. The chancellor allowed the complainant, in the statement of the account between the parties, the sum of $800 as due her for money loaned to James H. Clapp. We think this amount as a claim for money loaned, fairly sustained by the evidence, and would not be disposed to disturb such finding were it for a larger amount, as we are impressed the money of Mary Ann Clapp went into said real estate, and James H. Clapp recognized the same as an existing obligation as late as a year prior to his death.

The evidence further shows that lot 30 is improved with a three-story brick flat-building, and that lot 31 is improved with a two-story frame building consisting of two flats, the lower of which was occupied by James H. Clapp and family and is now occupied by complainant as a homestead, and the upper of which was rented by him, and has been occupied, at least a part of the time, by tenants since his death; also by a frame cottage upon the rear portion thereof, which is also occupied by a tenant. The complainant remained in possession of all of said premises and collected rents therefor until about

September 1, 1900, when the heirs of James H. Clapp re-
covered possession thereof through an action of forcible
detainer, with the exception of the two-story frame build-
ing, and have collected the rents therefor since that time.
The court held, in stating the account between the par-
ties, that the complainant was entitled to the possession
of both flats in said frame building as her homestead,
after the death of James H. Clapp, and refused to require
her to account for the rent collected by her for the upper
flat,—the one not occupied by her as a homestead. The
portion of the building occupied by her was of much
greater value than $1000, and we are of the opinion,
especially in view of her understanding with Albert G.
Clapp that she would rent the premises and that her
rights and the rights of the heirs would be subsequently
adjudicated, that there was error in refusing to require
her to account for the rent of said flat. In case a house-
holder occupies a flat in a flat-building, or an apartment
in an apartment building, as a homestead, his residence
is as much disconnected from the other flats or apart-
ments located in said building as though the portion
thereof occupied by him was located upon a different lot
or under a different roof; and while in a case like this
it might work no great harm to hold the widow, after
the death of the householder, might rightfully retain the
possession of the entire building until her homestead was
assigned, if the principle were applied to a building con-
taining, as is often the case in large cities, many flats or
apartments, it would lead to absurd results. Especially
would that be true where the widow remained in the
apartment with the understanding that she would rent
the balance of the premises and account to the heirs for
the rent, and it seems clear to us that the complainant
should have been required to account for the rents which
she collected upon the upper flat in the frame building,
subsequent to James H. Clapp's death. In *Tiernan* v.
*Creditors,* 62 Cal. 286, it was held that in the case of a

double house on a city lot intended for two families, one part of which was leased to a tenant and the other occupied by the owner, the owner could not claim as a homestead that portion of the building not occupied by him; and in *Dyson* v. *Sheley*, 11 Mich. 527, it was held that in order that premises may be exempted as a homestead, they must be set apart as a homestead for the purposes of the owner and his family, and where the owner of a city lot built a double house upon it in such a way as to show that he designed it for the use of two families and not for one, and leased one part of it and occupied the other himself, that he could not claim the latter as exempt from execution sale as a homestead, and that the fact that the yard of the part leased was used by the owner in common with the tenant would not vary the case. To the same effect are *Rhodes, Pegram & Co.* v. *Mc-Cormack*, 4 Iowa, 368, and *Mayfield* v. *Marsden*, 59 id. 517.

We are also of the opinion that the court erred in decreeing that the complainant, Mary Ann Clapp, was entitled to dower in said real estate absolutely, and not subject to the right of dower therein of Mary M. Clapp. The court held Mary M. Clapp was entitled to dower in said real estate, and that part of the decree has not been questioned. The decree should have first provided that Mary Ann Clapp recover an estate of the value of $1000 in the portion of the real estate occupied by James H. Clapp at the time of his death, as a homestead; that Mary M. Clapp recover dower in said real estate subject to the homestead therein of Mary Ann Clapp, and that Mary Ann Clapp recover dower therein subject to her homestead estate and the dower estate of Mary M. Clapp; (*Stahl* v. *Stahl*, 114 Ill. 375;) that is, first a homestead of the value of $1000 should have been set off to Mary Ann Clapp; second, one-third in value of the real estate remaining should have been assigned to Mary M. Clapp as her dower; and third, one-third of the real estate remaining should have been assigned to Mary Ann Clapp

as her dower, and in case she survived Mary M. Clapp she would be endowable of one-third of the portion assigned to Mary M. Clapp as dower in addition to the amount already assigned to her.

In the division of rents, after deducting the homestead, Mary M. Clapp should receive the one-third part thereof from the time she intervened, and Mary Ann Clapp should receive one-third of two-thirds of the rent from the date of the death of James H. Clapp. The agreement with Albert G. Clapp, one of the heirs, whereby she was to remain in possession of the property and collect the rents, made a demand for dower on her part unnecessary. *Strawn* v. *Strawn's Heirs*, 50 Ill. 256.

The only estate of which James H. Clapp died seized is the real estate described in this bill, and whatever debts and claims, including the widow's award and the expenses of administration, that are legally provable against his estate must be paid from the income thereof or a sale of the whole or a part of the said real estate, and as the complainant is the only creditor and she and the defendants are the only persons interested in said estate, we see no objection to a full settlement and adjustment in this suit of all claims or matters in difference between them relative to said estate and to a full determination of their interest in said real estate, including the adjustment of rents arising therefrom and improvements made thereon. While equity will not ordinarily take upon itself the settlement of the estate of deceased persons, in a proper case it may assume such jurisdiction, and this case seems to fall within the class of cases where such jurisdiction may be assumed.

Upon the case being re-instated below, it should be re-referred to the master to state an account between the parties as to the rents and profits which have accrued from said real estate since the death of said James H. Clapp, and the parties should be charged with the rents collected by them, respectively, and credited with the

amounts they have rightfully paid out in improving or preserving said real estate, including the expenses incurred by the complainant in completing said cottage, and the complainant should be credited with the several amounts allowed her for money loaned, widow's award, expenses of administration, and the balance found to be due her decreed to be a lien upon said real estate, and a decree entered fully settling the rights of the parties in said real estate.

The decree will therefore be affirmed in part and reversed in part and remanded to the circuit court, with directions to proceed to a final determination of the case in accordance with the views herein expressed, and the complainant will pay one-third and the defendants two-thirds of the costs occasioned by this appeal.

*Decree reversed in part, and remanded.*