(No. 6967. April 23, 1942)

MARGARET E. NICHOLAS, on her own behalf as widow, and on behalf of Billy Nicholas, Maxine Nicholas, Lawrence Nicholas, Doris Nicholas and Mary Nicholas, Respondent, and GENEVA NICHOLAS HOTTEL, Guardian, on behalf of Lawrence Ralph Nicholas, Doris Jean Nicholas and Mary Evelyn Nicholas, Appellant, v. IDAHO POWER COMPANY, Employer, Respondent.

(125 Pac. (2d) 321)

Merrill & Merrill, for Appellant.

Samuel  Adelstein,  for  Respondent,  Margaret  E. Nicholas.

A. C. Inman, for Respondent, Idaho Power Company.

AILSHIE, J.—Ralph A. Nicholas, aged 42, was employed by the Idaho Power Company at a compensation of $170 per month. April 2, 1941, while working on a pole line near Aberdeen, he was injured and, as a result of such injury, died April 9, 1941. The Power Company was duly notified of the employee's injury and death. April 12, 1941, claim for compensation by Margaret E. Nicholas, as widow of decedent, on behalf of herself and five dependent minor children named therein, was filed with the Industrial Accident Board.

A second claim for compensation was filed April 24, 1941, by Geneva Nicholas Hottel, as mother and guardian of three of the above mentioned five children, namely, Lawrence Ralph Nicholas, Doris Jean Nicholas, and Mary Evelyn Nicholas, minor children of the decedent, born to Geneva while the wife of Nicholas, and prior to his marriage to Margaret. The claim of Geneva was for "just the children."

The Power Company admitted liability for the accident;

and the only controversy was in relation to the division or distribution of the compensation payments. June 14, 1941, the Power Company filed a petition, praying that a time and place be fixed for hearing, on the question as to "division of compensation" between the respective claimants. July 25th, a hearing was had by the Board, at which counsel for the company contended and represented, that "The whole matter is to determine the proper parties to participate in and receive the statutory compensation" to be awarded. Proof was submitted, showing the total earnings for the year preceding Nicholas' death to be $2123.50. After proofs were submitted, the Board found that Nicholas was earning average weekly wages of $40.84; and that the injury occurred while the decedent was engaged in the course of his employment. The Board made findings and conclusions and entered the following award:

"WHEREFORE, IT IS ORDERED, AND THIS DOES ORDER, That the claimant, Geneva Nicholas Hottel, as the guardian of the minors, Lawrence Ralph Nicholas, Doris Jean Nicholas, and Mary Evelyn Nicholas be, and she is hereby, awarded against the defendant, Idaho Power Company, weekly compensation at the rate of $4.00 for the use and benefit of said minor children from and after the 9th day of April, 1941, until the 20th day of July, 1948, provided that the said Lawrence Ralph Nicholas, Doris Jean Nicholas, and Mary Evelyn Nicholas, or any of them, live until said 20th day of July, 1948, or any of them remain unmarried until said date.

"That the claimant, Margaret E. Nicholas, as the widow of the said Ralph A. Nicholas, be, and she is hereby, awarded against the Idaho Power Company for the use and benefit of herself and her minor children, Billy Nicholas and Maxine Nicholas, weekly compensation in the sum of $8.00 from and after the 9th day of April, 1941, until the 20th day of July, 1948, and thereafter weekly compensation at the rate of $12.00 until her death or remarriage, but not to exceed a period of 400 weeks from and after the 2nd day of April, 1941."

Appellant, Geneva Nicholas Hottel, whom we shall

hereafter designate as Geneva, was married to Nicholas October 13, 1921; and of this marriage, three of the children (Lawrence Ralph, Doris Jean, and Mary Evelyn Nicholas), for whom compensation is claimed, were born. December 3, 1934, Geneva procured a divorce from Nicholas, which decree awarded her the custody and care of the children and required Nicholas to pay her the sum of $50 per month, as alimony for support of herself and minor children, which he paid "most of the time." She thereafter married Hottel.

December 21, 1934, at Salt Lake City, Utah, Nicholas entered into a ceremonial marriage with claimant, whom we will hereinafter designate as Margaret, who had theretofore been married (March 1, 1926) to Jesse W. Hutchinson. At the time of Margaret's marriage to Nicholas, she had two minor children, Billy and Maxine, who had been born of her marriage to Hutchinson. After the marriage between Margaret and Nicholas, the Hutchinson children, Billy and Maxine, lived with Margaret and Nicholas, and were known and called by the name Nicholas, at Nicholas' request. It appears that Nicholas assumed the responsibility of a father to these two children after his marriage to Margaret. It seems clear, as a fact, and follows as a matter of law, that they were his dependents at the time of his injury and death. (Secs. 43-1105 and 43-1102, I. C. A.)

The real issue in the case arises over the question, as to whether or not the marriage between Nicholas and Margaret was legal; and whether she became his "widow" at the time of his death.

It is contended, first, that Nicholas' marriage with Margaret, within the period of less than six months after the divorce was granted to Geneva, was void. Sec. 31-207, I. C. A. provides, *inter alia*, as follows:

"A subsequent marriage contracted by any person during the life of a former husband or wife of such person, with any person other than such former husband or wife, is illegal and void from the beginning unless:

1. The former marriage of either party has been annulled or dissolved more than six months; . . . . "

Nicholas and Margaret were married in Utah within

eighteen days after the divorce was granted to Geneva.

In the absence of pleading and proof to the contrary, the presumption is that the laws of Utah are the same as the laws of Idaho. *Mason v. Pelkes*, 57 Idaho 10, 34, 59 Pac. 2d 1087; *Mechanics & Metals Natl. Bank v. Pingree*, 40 Ida. 118, 232 Pac. 5; *Maloney v. Winston Bros. Co.*, 18 Ida. 757, 111 Pac. 1086.

Margaret contends that, having proved a regular ceremonial marriage with Nicholas and having continued to live with him as his wife, from that time until his death, renders it immaterial as to whether such ceremonial marriage was, at the time solemnized, void or voidable under the statute, for the reason that, after the time limit of six months expired, and the *time impediment* was removed; and they continued to live together and in all respects conducted themselves as husband and wife, the marital contract was ratified and adopted and could no longer thereafter be questioned.

The statute, sec. 31-201, which defines marriage as a civil contract, says: "Consent alone will not constitute marriage; it must be followed by a *solemnization, or by a mutual assumption of marital rights, duties or obligations.*" (Italics supplied.) In this case, both conditions of the statute have been met; and even though there was a time impediment existing when the ceremonial marriage took place, after that impediment ceased, the "mutual assumption of marital rights, duties or obligations" *continued* in good faith.

There is abundant authority for holding that "where the original cohabitation was preceded by a ceremonial marriage which was void because one of the parties was already married, . . . . the continuance of cohabitation after the removal of the impediment by the death of the former husband or wife, in connection with circumstances tending to show that the parties regarded their relations as of a matrimonial character, and held themselves out as husband and wife, created a presumption of marriage, although there was no evidence of another ceremony."

(Note and cases cited to *Chamberlain v. Chamberlain*, 68 N. J. Eq. 414, 62 Atl. 680, 3 L. R. A., N. S., 244.)

In re *Mo-Se-Che-He's Estate,* 107 Pac. 2d 999, 1004, the Oklahoma court said:

"It has often been held that where a person marries within six months after procuring a divorce, such marriage may ripen into a valid common law marriage where the parties continue to live together as man and wife after the expiration of the six months' period. But this is purely because of the conduct of the parties after the expiration of the six months."

■ The marriage between Nicholas and Margaret was duly proven in accordance with the provisions of sec. 31-309, I. C. A., by the *original certificate of the marriage ceremony* which occurred on the 21st day of December, 1934. The presumption of law arises, upon proof of the marriage, that the officer or clergyman, who performed the ceremony, discharged his duty under the law and found the parties eligible to enter into the marriage relation. The statute, sec. 31-302, provides as follows:

"All persons herein authorized to solemnize marriages must ascertain and be assured of:

1. The identity of the parties.

2. Their real and full names and places of residence.

3. That they are of sufficient age to be capable of contracting marriage.

4. If the male is under the age of eighteen or the female under the age of eighteen years, the consent of th father, mother or guardian, if any such, is given, or that such non-aged person has been previously but is not at the time married; and that the parties applying for the rites of marriage, and making such contract, have a legal right so to do."

In *Mauldin v. Sunshine Mining Co.,* 61 Idaho 9, 17, 97 Pac. 2d 608, we recently reiterated the doctrine announced in *Huff v. Huff,* 20 Idaho 450, 118 Pac. 1080; *LaBonte v. Davidson,* 31 Idaho 644, 175 Pac. 588; *Smith v. Smith,* 32 Idaho 478, 185 Pac. 67, (cited with approval in *Alto v. State I. A. Comm.,* 118 Ore. 231, 246 Pac. 359) and authorities from other jurisdictions, all holding as follows:

"The rule adopted in this jurisdiction is that the law

presumes morality, and not immorality; marriage, and not concubinage; legitimacy, and not bastardly, every intendment of the law leans to matrimony. When a marriage has been shown in evidence, whether regular or irregular, and whatever the form of proof, the law raises a strong presumption of its legality, casting the burden of proof upon the party objecting and requiring him in every particular, to make plain, against the constant pressure of this presumption the truth of law and fact that the marriage is illegal and void."

It is a well-recognized and wholesome presumption of law, that one, who enters into a second marriage contract with a third party, does so lawfully; and, that the first husband or wife was either deceased or had obtained a divorce prior to such second marriage.

Some of the courts, from which appellant cites authorities, take a different view of the force and weight of legal presumptions in such cases, from that adopted by this court. That is true with the West Virginia decisions. (See *Johnson v. State Comp. Commr.,* 116 W. Va. 232, 179 S. E. 814; *Hall v. Baylous,* and note, 109 W. Va. 1, 153 S. E. 293, 69 A. L. R. 527.) The Ohio court holds to the same effect. (See *Industrial Comm. of Ohio, v. Dell,* 104 Ohio St. 389, 135 N. E. 669, 34 A. L. R. 422.) In re rebuttal of presumptions, see *Lewis v. Dept. of L. & I.,* 190 Wash. 620, 70 Pac. 2d 298.

Appellant contends that, under sec. 31-207, I. C. A., the marriage between Margaret and Nicholas was "illegal and void from the beginning"; while counsel for respondent contends that, at most, it was only voidable.

Considering all the provisions of the statute together, it seems evident that the legislature did not mean to make such second marriage void *without a finding of fact and decree to that effect.* It is not self-operative and executing, in so far as it relates to civil liabilities and obligations, although it may be timely repudiated and abandoned by either party. This view of the statute is borne out by the provisions of chapter 5, title 31, comprising secs. 31-501, to and including 31-505. Sec. 31-501 specifies the grounds on which an *annulment* may be had and subdivision 2 thereof says:

"That the former husband or wife of either party was living, and the marriage with such former husband or wife was then in force."

Sec. 31-502 specifies the *parties* who can maintain such an action and the limitations within which such action can be maintained; among other things, it says:

"An action to obtain a decree of nullity of marriage, for causes mentioned in the preceding section, must be commenced within the periods and by the. parties as follows: . . . .

"2. For causes mentioned in subdivision two; by either party during the life of the other, or by such former husband or wife."

So the legislature thought that no one should maintain such an action except *one of the three parties to the triangle.*

There is further evidence that it was not intended that such a marriage should be absolutely void from the beginning, without decree of annulment, because sec. 31-503 provides that an annulment shall not affect the legitimacy of children begotten before the judgment of annulment; and, finally, sec. 31-505 provides that the judgment of nullity of a marriage shall be "conclusive only as against the parties to the action and those claiming under them." By this latter section, it was evidently intended to protect third parties who had dealings with such husband and wife and might be precluded by the judgment of annulment.

██ It is next contended that Nicholas' marriage with Margaret was void, for the reason that *she had a living husband,* (Hutchinson) from whom she had not been divorced. This contention rests upon the evidence of the marriage between Hutchinson and Margaret in 1926; and the fact that she commenced an action for divorce from Hutchinson October 26, 1932; and the latter made a personal appearance November 1, 1932; and nothing further was done in the divorce action; and thereafter, Feb. 15, 1937, the action was dismissed by the court. This, of course, proves that *no divorce* was ever granted *in that action;* and that *Hutchinson was living on the date (November 1, 1932) of his appearance* in the case;

but it does not prove either that no divorce was ever granted Hitchinson or Margaret, or that Hutchinson was alive on the date Margaret's marriage with Nicholas was solemnized. The courts of the forty-four counties of the state were open to them to prosecute a divorce action during all this time.

18 R. C. L., sec. 44, p. 420, says: "Mere proof of a prior marriage and that one party had not obtained a divorce is not sufficient, for the other might have obtained such divorce and left him or her free to contract the second marriage."

(*Pittinger v. Pittinger,* 28 Colo. 308, 64 Pac. 195, 197, 89 Am. St. 193 and note; *Potter v. Clapp,* 203 Ill. 592, 68 N. E. 81, 96 Am. St. 322; note 19 Am. St. 409.)

In the case of *Immel v. Dowd,* 6 Cal. App. 2d 145, 44 Pac. 2d 373, 374, the court said:

"In the case of *Marsh v. Marsh,* 79 Cal. App. 560, 250 P. 411, 413, a question similar to the one we are considering was before the court. It was there said: 'It has been held time and again by the Supreme Court of this state that mere proof of a prior marriage and the continued life of both spouses is not sufficient to make a case against a second ceremonial marriage—that there must be a further showing that the first marriage has not been set aside by judicial decree.' *Estate of Hughson,* 173 Cal. 448, 160 P. 548; *Estate of Harrington,* 140 Cal. 244, 73 Pac. 1000, . . . . "

In 38 Corpus Juris, at p. 1328, (par. 104), the author says:

"In the case of conflicting marriage of the same spouse, the presumption of validity operates in favor of the second marriage. Accordingly the burden of showing the validity of the first marriage is on the party asserting it, and even where this is established *it may be presumed in favor of the second marriage that at the time thereof the first marriage had been dissolved either by a decree of divorce or by the death of the former spouse,* so as to cast the burden of adducing evidence to the contrary on the party attacking the second marriage." (Italics supplied.)

(See, also, *In re Borneman's Estate,* 35 Cal. App. 2d 455, 96 Pac. 2d 182, 184.)

In the case of *Moran v. Superior Court, etc.,* 100 Pac. 2d 1096, 1098, the California District Court of Appeal (3d dist.) held:

"In the absence of evidence to the contrary, the presumption of the validity of a final marriage, which is consummated by means of a formal ceremony, is superior to and controlling of the mere presumption that a prior marriage continues in force. The burden of proof is on the person who challenges the validity of a subsequent marriage to prove not only the former marriage, but also to show that it has not been dissolved by the death of the absent spouse or by a decree of divorce or annulment." . . . .

"It is evident from the language of the preceding section that the validity of a subsequent marriage depends upon the facts and circumstances under which it was consummated, and whether the former marriage had been actually dissolved."

(See, also, *In re Aguirre's Estate,* 57 Nev. 275, 62 Pac. 2d 1107, 1109; *Lopez v. Missouri, etc., R. Co.* (Tex. Civ. App.) 222 S. W. 695, 697.)

There was no prejudicial 'error in the exclusion of appellant's exhibit "B," (letter from Margaret to Brown of the Power Company) for the reason that its admission would not have proved either that Hutchinson was not dead or had not been divorced from Margaret prior to her marriage with Nicholas.

We conclude that Margaret is the widow of the deceased, Ralph Nicholas; and that her two children, by Hutchinson, (Billy and Maxine) who were in her custody and living with her and Nicholas at the time of his accident and death, and were bearing his family name and being treated as his children, were and are his dependents; (*O. A. & G. Corp. v. Ind. Comm.,* 34 Ariz. 175, 269 Pac. 77, 79) and that his own children (Lawrence Ralph, Doris Jean, and Mary Evelyn Nicholas) by Geneva, and in her custody, to whom he was making payments of alimony for their support, were also dependents of Nicholas and en-

titled to share, through their guardian, in the compensation allowance.

The order is affirmed. No costs awarded.

Givens, C.J., and Budge, Morgan, and Holden, JJ., concur.